***********
The Full Commission reviewed the prior Order and prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Holmes, the records contained in the Commission's file in this matter and the briefs before the Full Commission. The appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence, the Full Commission reverses the Deputy Commissioner's denial of benefits and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. At all relevant times, the parties were bound by the provisions of the North Carolina Workers' Compensation Act, and an employer/employee relationship existed between the parties on or about November 24, 1997.
2. Plaintiff sustained an injury by accident to his left shoulder on November 24, 1997, while employed as a tire technician with defendant.
3. Plaintiff's average weekly wage is $671.91, resulting in a weekly compensation rate of $447.96.
4. As a result of his compensable injury by accident, plaintiff received temporary total disability benefits during the following periods:
(a) February 21, 1998, to August 31, 1998;
(b) September 3, 1998, to September 18, 1998; and
(c) September 23, 1998, to January 20, 1999.
5. Defendant filed a Form 24, Application To Terminate Or SuspendPayment Of Compensation, on December 10, 1998, contending Plaintiff was released to return to work with no restrictions on November 25, 1998, by his treating physician, Dr. Patrick Connor, and further contending plaintiff had reached maximum medical improvement.
6. A telephonic hearing took place on January 13, 1999, with Special Deputy Commissioner James C. Gillen, who, by an Administrative Decision and Order filed January 20, 1999, allowed defendant's Form 24 application, effective November 25, 1998, finding that defendant had rebutted the presumption of continuing disability.
7. Defendant terminated temporary total disability benefits on January 20, 1999.
8. Defendant was unable to accommodate plaintiff's work restrictions as of July 15, 1999.
9. The issues to be determined are:
 (a) Whether Special Deputy Commissioner James C. Gillen properly allowed defendant to terminate plaintiff's temporary total disability benefits, effective November 25, 1998;
 (b) Whether any of the medical treatment for permanent partial disability plaintiff has incurred since November 25, 1998, is compensable by defendant;
 (c) Whether plaintiff is totally disabled as of July 15, 1999; and
 (d) Whether plaintiff continues to be totally disabled as a result of his compensable injury, such that he is still entitled to temporary total disability benefits.
10. Any and all Industrial Commission forms filed by either party and any and all Decisions and Orders and Awards filed by the Industrial Commission, as well as plaintiff's medical records, shall be received in evidence.
 ***********
Based on the competent evidence of record and the reasonable inferences, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff began working at defendant's tire manufacturing plant in Charlotte, North Carolina, in 1980.
2. On November 24, 1997, plaintiff sustained an admittedly compensable injury by accident to his left shoulder when, while turning a tire buggy at work it got caught on the floor jerking plaintiffs left arm and shoulder.
3. Defendant accepted plaintiff's shoulder claim as compensable by filing a Form 60 dated February 26, 1998 and thereafter also providing medical benefits. On December 10, 1998, defendant filed a Form 24Application to Terminate Payment of Compensation Pursuant to N.C.G.S. § 97-18.1. On January, 20, 1999, Special Deputy Commissioner James C. Gillen issued an Order allowing defendant to terminate payment of compensation effective November 25, 1998.
4. On January 26, 1999, plaintiff filed a Form 33 Request for Hearing
alleging he was not at maximum medical improvement, had not been returned to work without restrictions and was entitled to a continuation of temporary total disability benefits.
5. On December 1, 1997, defendant referred plaintiff to Arrowood Medical Center for treatment. Dr. Bradner diagnosed a left shoulder strain and treated plaintiff conservatively until December 30, 1997 when Dr. Bradner referred plaintiff for an orthopedic evaluation. Plaintiff was returned to work on restricted duty throughout Dr. Bradner's treatment.
6. On January 9, 1998, plaintiff presented to Dr. Ronald Singer at the Miller Orthopaedic Clinic who diagnosed plaintiff with left shoulder impingement with possible anterior instability. Dr. Singer initially treated plaintiff conservatively and on February 13, 1998 continued him on restricted duty of lifting, pulling and torquing no greater than 15 pounds with the left arm, no repetitive motion with the left arm and no overhead work. Because of his compensable injuries, plaintiff became totally unable to earn wages on February 14, 1998.
7. On February 25, 1998, plaintiff underwent an MRI, which revealed findings consistent with impingement syndrome and AC arthritis.
8. On March 5, 1998, Dr. Singer recommended that plaintiff consider surgery. On March 18, 1998, Dr. Singer performed a diagnostic arthroscopy of the left shoulder, debridement of the anterior glenoid labrum and arthroscopic subacromial decompression. Dr. Singer's post-op plan was to provide the plaintiff with aggressive mobilization without specific limitation in terms of range of motion and strengthening of the left shoulder. Dr. Singer opined at the time of plaintiff's surgery that plaintiff at some point in the future, may require a capsular shrinkage procedure versus open capsulorraphy to his left shoulder.
9. On March 23, 1998, plaintiff began physical therapy at Carolinas Physical Therapy Network. On May 12, 1998, plaintiff returned to see Dr. Singer complaining of spasms and pain while performing overhead movement in physical therapy. Dr. Singer ordered that he continue with physical therapy. Plaintiff again returned to see Dr. Singer on June 12, 1998 where he complained of significant weakness and shaking in his shoulder with any movement of his left arm above his shoulder. Dr. Singer again ordered plaintiff to continue with physical therapy.
10. On August 7, 1998, plaintiff returned to see Dr. Singer who noted that plaintiff had continued to work in physical therapy, continued to describe a pop in his left shoulder and continued to have pain with any overhead activity. Dr. Singer nonetheless renewed physical therapy. He also restricted plaintiff to lifting no more than five pounds nor any overhead work with his left arm.
11. Defendant did not accommodate these restrictions and plaintiff remained out of work and continued to receive weekly indemnity benefits.
12. Plaintiff again returned to see Dr. Singer on August 28, 1998 still complaining of shaking in his left shoulder when attempting to lift overhead which was noted by Dr. Singer. Dr. Singer returned plaintiff to work at this time limiting plaintiff to working only four hours per day.
13. Defendant paid temporary total disability benefits through August 31, 1998 and thereafter resumed paying on September 3, 1998 after an unsuccessful return to work by plaintiff.
14. On September 11, 1998, Dr. Singer, based on plaintiff's inability to work unrestricted, restricted plaintiff from lifting greater than 20 pounds overhead. Defendant again suspended temporary total disability benefits on September 19, 1998 as it attempted to accommodate the 20-pound lifting restriction and return plaintiff to work. However, defendant once again resumed temporary total disability benefits effective September 23, 1998 when this attempt by plaintiff to return to work with the 20-pound lifting restriction also failed.
15. On September 23, 1998, Dr. Patrick Connor, examined plaintiff at the request of Dr. Singer due to plaintiff's continued left shoulder pain. Dr. Connor diagnosed plaintiff with continued left shoulder pain following the arthroscopic decompression and recommended plaintiff would need a gradual return to work plan and a work-hardening program. Plaintiff began the work-hardening program at The Rehab Center on October 1, 1998. Upon entering the program, he complained that he was unable to lift any weight overhead nor could he raise his left arm above his shoulder. Plaintiff also reported increased pain with any overhead movement. On October 13, 1998, physical therapist, Jana Van Rooyen, noted that plaintiff was prompt for and had completed five of six treatments. Ms. Van Rooyen notes plaintiff was fearful of the popping, clicking and swelling in his left shoulder. Plaintiff also reported the development of a large knot on the front part of his left shoulder with any activity. Despite these symptoms, Ms. Van Rooyen increased plaintiff's participation in work hardening to five hours per day with a goal of getting to realistic work simulation activities. On October 14, 1998, while at work hardening, plaintiff again experienced a large knot developing along the front part of his left shoulder after performing work-conditioning simulations. Because of this condition, plaintiff was referred back to see Dr. Connor.
16. Plaintiff returned to see Dr. Connor on October 20, 1998 who noted plaintiff had a new complaint of "very localized swelling and associated pain in the anterosuperior aspect of his left shoulder." Dr. Connor reported the swelling had also been noted by physical therapist, Jana Van Rooyen. In order to rule out a fistula in the anterior portion of the plaintiffs left shoulder, Dr. Connor ordered a gadolinium enhanced MRI and restricted plaintiff to lifting no more than 20 pounds overhead with his left arm. Defendant continued to be unable to accommodate the 20-pound overhead lifting restriction and plaintiff continued to receive temporary total disability benefits.
17. Plaintiff returned to work hardening the next day at the Rehab Center and thereafter participated in twelve additional days of treatment that ultimately concluded on November 11, 1998. Throughout the twelve-day period, plaintiff continued to complain of swelling, pain and the inability to raise his left arm above his shoulder.
18. On November 5, 1998, plaintiff underwent an MRI of his left shoulder and followed up with Dr. Connor on November 13, 1998. Dr. Connor indicated that he had reviewed the MRI and was "concerned about the area of the rotator interval and the superior aspect of the subscapularis as well as some fluid tracking through the soft tissues." Because of this concern, Dr. Connor took plaintiff out of work. In addition to writing plaintiff out of work, Dr. Connor wanted to review plaintiff's MRI with Drs. Coumas and Wertmuller. Together, these doctors opined that the MRI revealed no evidence of a fistula and the contrast noted on the MRI was likely an artifact from the gadolinium injection. Based on this assessment, Dr. Connor stated the plan would be to return plaintiff' to work without restrictions as previously noted by Dr. Singer. However, Dr. Singer had never returned plaintiff to unrestricted full duty work.
19. On December 10, 1998, plaintiff again returned to Dr. Connor regarding continued complaints of pain and swelling in his left shoulder. Dr. Connor was unable to offer any assistance and gave to plaintiff the names of four shoulder specialists in which plaintiff could call for a second opinion. He also renewed plaintiff's previous work restriction of lifting no more than 20 pounds overhead. Neither Dr. Connor nor Dr. Singer had indicated at that time or at any time previously that plaintiff was at maximum medical improvement nor did either doctor provide the plaintiff with an impairment rating to his shoulder. Plaintiff provided to defendant a copy of his December 10, 1998 work note but defendant did not offer him a job at this time.
20. On May 24, 1999, a little more than five months after Dr. Connor's last exam, plaintiff returned to see Dr. Connor with symptoms similar to those he had on December 10, 1998. Dr. Connor noted again that plaintiff continued to experience significant swelling in the front part of his left shoulder with any movement and conceded that a fistula may have been missed in the November 5, 1998 MRI. On June 11, 1999, plaintiff returned to see Dr. Singer who recommended another surgery due to plaintiff's persistent left shoulder pain. Dr. Singer also continued plaintiff's 20-pound overhead lifting restriction. Defendant again failed to offer plaintiff a position at that time.
21. On July 15, 1999, Dr. Connor performed an EUA left shoulder revision, left glenohumeral arthroscopy, arthroscopic repair of labral tear, electro thermal arthoscopic capsulorrhophy and open rotator internal plication and repair on plaintiffs left shoulder. Plaintiff was totally disabled from work at that time. Even though Dr. Connor's post-op notes indicate a medical finding supporting plaintiff's complaints that began on October 13, 1998, and despite plaintiff's disability from work, defendant did not resume paying temporary total disability benefits.
22. On July 29, 1999, plaintiff began physical therapy at Carolinas Physical Therapy Network per an order from Dr. Connor. On July 30, Dr. Connor examined plaintiff and returned him to work with no use of the left arm. Defendant could not and did not accommodate this restriction and plaintiff remained out of work. Plaintiff began participating in physical therapy on July 29, 1999. On August 19, 1999, plaintiff began to complain to his physical therapist of numbness in the ring and small fingers of his left hand. On August 30, 1999, plaintiff again complained of tingling and numbness in the ring and small finger of his left hand and told his physical therapist that he felt he overdid his exercises at home. Plaintiff again mentioned the numbness in the same two fingers on his left hand while at physical therapy on September 2, 1999.
23. On September 3, 1999, plaintiff returned to Dr. Connor, who noted the numbness and tingling symptoms in plaintiff's left hand. Dr. Connor also noted that these symptoms had just recently arisen. Dr. Connor continued plaintiff's participation in physical therapy and gave work restrictions of lifting no greater than 20 pounds, no overhead work and no repetitive motion greater than 10 pounds. Plaintiff returned to physical therapy on September 8, 1999 and continued to complain of tingling and numbness in the same two fingers on his left hand, pain in his left shoulder and muscle spasms.
24. On October 5, 1999, plaintiff returned to see Dr. Connor who noted plaintiff felt like he might have overdone it with some increased weights which resulted in shaking, spasms and swelling in the left shoulder. Dr. Connor reduced physical therapy to two times per week with emphasis on more specific strengthening and further restricted plaintiff to lifting, pulling, torquing, pushing or carrying no greater than 10 pounds, no repetitive motion greater than 5 pounds and no overhead work. Plaintiff again returned to physical therapy on October 19, 1999 and continued through to completion on November 11, 1999. Plaintiff's condition as it relates to the numbness and tingling in his left arm and fingers during this period of time did not appreciably improve.
25. On November 17, 1999, plaintiff returned to see Dr. Connor and continued to complain of shaking and pain as well as tingling and numbness in the two fingers of his left hand. Dr. Connor felt at that time that he had nothing further to offer plaintiff for his shoulder. He also voiced concern for plaintiffs neurological complaints and symptoms and referred plaintiff to Dr. John Welshofer at Miller Orthopaedic Clinic. Dr. Connor also referred him to work hardening at that time indicating plaintiff could return to full duty work after he completed the work hardening program. It was at this appointment that Dr. Connor released plaintiff from his care and gave him an 8% permanent partial impairment to his left shoulder. Plaintiff remained out of work at that time.
26. On November 29, 1999, plaintiff was examined by Dr. Welshofer, who diagnosed plaintiff with a possible cervical radiculopathy or brachial plexopathy and recommended EMG testing of his left upper extremity. He also recommended plaintiff continue with work conditioning and restricted plaintiff to right hand work only. On December 8, 1999, Dr. Welshofer, based on the result of the EMG/NCS, recommended a contrast enhanced CT from C4 to T1 to rule out cervical disc involvement. Dr. Welshofer restricted the plaintiff from all work and discontinued work conditioning.
27. On December 23, 1999, plaintiff underwent a CT of his cervical spine, which revealed a large disc herniation at C6-7 level. On December 29, 1999, plaintiff returned to see Dr. Welshofer who noted the C6-7 disc herniation and found it interesting that plaintiff had mostly arm pain instead of neck pain. Dr. Welshofer continued to restrict plaintiff from work and referred him to Dr. Craig Brigham at Miller Orthopaedic Clinic.
28. On January 10, 2000, plaintiff was examined by Dr. Brigham who diagnosed plaintiff with a left C6-7 disc herniation "that most likely occurred while getting treatment for his left shoulder problem." He went on to state that he believed it "reasonable that comp consider this a work-related injury as he was undergoing active treatment for his documented shoulder problem at the time of the disc herniation." He recommended an anterior C6-7 partial miscrodisectomy. Dr. Brigham restricted plaintiff from work at that time. The Full Commission finds that this disc herniation did indeed happen while plaintiff was being treated for his compensable injuries and is itself therefore compensable.
29. On February 15, 2000, plaintiff underwent a C6-7 left partial microdisectomy by Dr. Brigham. On February 23, 2000, Dr. Brigham recommended a work hardening program and continued him out of work. Plaintiff began work conditioning on March 2, 2000 at HealthSouth and completed a total of six treatments. On March 15, 2000, plaintiff returned to see Dr. Brigham complaining of neck spasms and left hand snakes. Dr. Brigham diagnosed post-discectomy instability with persistent neural irritation and recommended another cervical discectomy and fusion with allograft. Dr. Brigham continued plaintiff out of work at that time.
30. On April 5, 2000, plaintiff underwent a cervical CT with contrast, which, according to Dr. Brigham, revealed evidence of instability with a double lamina sign at C6-7 level. On May 30, 2000, plaintiff underwent the C6-7 microdisectomy and fusion as recommended by Dr. Brigham. On July 6, 2000, Dr. Brigham stated plaintiff had reached maximum medical improvement, rated him at 5% and released him to full duty work with regard to his neck. With regard to his left shoulder, plaintiff returned to see Dr. Connor on June 28, 2000 due to increased symptoms of pain.
31. Dr. Connor found nothing new as it relates to plaintiff's shoulder and did not recommend any additional treatment. He permanently restricted plaintiff from doing any repetitive motion or overhead work with the left shoulder. Plaintiff returned to see Dr. Connor again on September 18, 2000, who felt nothing had changed from a shoulder standpoint.
32. On October 26, 2000, plaintiff returned to see Dr. Brigharn because of continued symptoms of numbness and weakness. Dr. Brigham ordered a cervical MRI as well as a brain MRI to rule out a stroke. Defendant authorized the cervical MRI but refused to authorize the brain MRI. On November 22, 2000, Dr. Brigham reviewed the MRI of the cervical spine with the plaintiff and released him with the same rating. Dr. Brigham did not review the brain MRI, as it was not available to him at the November 22, 2000 exam.
33. Plaintiff is currently treating with Dr. Eric Borrenson, a neurologist. With the exception of the medical treatment provided by Dr. Borrenson, defendant has paid for all plaintiff's medical treatment associated with his left shoulder and neck injuries.
34. Plaintiff is currently permanently restricted from doing any repetitive motion and/or any overhead work with the left shoulder. Dr. Connor has given plaintiff an 8% permanent partial impairment rating to his left shoulder and Dr. Brigham has provided a 5% permanent partial impairment rating to plaintiff's neck. Plaintiff returned to work with defendant on May 15, 2001 earning a wage less than his pre-injury wage. Defendant is not paying temporary partial disability benefits at this time.
35. Plaintiff is the owner and operator of two bars, "Jim Arnold's Pool and Billiards" and "McNeil's Tavern," and he worked at these bars before and after his release from Dr. Connor's care on November 25, 1998. Plaintiff testified at the hearing before the Deputy Commissioner that, as an operator of these two bars, he performed tasks, including carrying cases of liquor, stocking and tending bar, and sweeping with a broom.
36. Bill Bagley, Safety Director for defendant, testified at the hearing before the Deputy Commissioner that defendant had jobs available to plaintiff that would have accommodated any work restrictions plaintiff might have had through July 15, 1999. This testimony is found not to be credible.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained a compensable injury by accident to his left shoulder on November 24, 1997, while employed by defendant. N.C. Gen. Stat. § 97-2(6).
2. Special Deputy Commissioner James C. Gillen's approval of defendant's Form 24 Application to Discontinue Compensation was in error and should be vacated. Plaintiff was under restrictions from a physician and was not able to return to work unrestricted.
3. The shoulder problems plaintiff experienced after his release by Dr. Connor on November 25, 1998, are causally related to his injury by accident of November 24, 1997, and plaintiff is entitled to compensation from defendant for medical treatment of his shoulder and neck. N.C. Gen. Stat. § 97-2(6) and § 97-31.
4. Plaintiff's injury while undergoing physical therapy for a compensable injury is itself compensable under the Workers Compensation Act.
5. Plaintiff is entitled to temporary total disability compensation for those periods when he was unable to earn wages because of his compensable injury at work and his subsequent injury during treatment for his compensable injury.
6. Plaintiff is entitled to temporary partial disability compensation for those periods when he was able to earn wages but was able to earn less than his average weekly wage, with this entitlement ending 300 weeks after his last compensable injury.
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Special Deputy Commissioner James C. Gillen's Decision and Order regarding defendant's Form 24, Application to Discontinue Compensation,
filed January 20, 1999, is hereby VACATED as is the Opinion and Award of Deputy Commissioner Phillip A. Holmes filed January 17, 2001.
2. Defendant shall pay temporary total disability compensation of $447.96 per week from January 20, 1999 until May 15, 2001, subject to attorney fees set forth below. This amount has accrued and shall be paid in a lump sum with interest from June 26, 2000 at the rate of 8 percent per year. Defendant shall pay 3/4 of the lump sum and all of the interest to plaintiff. Defendant shall pay 1/4 of the lump sum and none of the interest to plaintiff's attorney.
3. Defendant shall pay temporary partial disability consisting of 2/3 of the difference between plaintiff's average weekly wage of $671.91 and such lesser wage that plaintiff is able to earn from week to week from May 15, 2001 and continuing until plaintiff is able to earn the same or greater wages than $671.91 per week with an outside limit of 300 weeks from the date of his latest compensable injury. Since this amount may fluctuate from week to week, defendant shall pay 3/4 of each week's temporary partial disability payment to plaintiff and 1/4 directly to plaintiff's counsel.
4. Defendant shall pay all medical bills resulting from plaintiff's compensable injuries, in accordance with §§ 97-25 and 97-25.1 of the North Carolina General Statutes.
5. Defendant shall pay an expert witness fee of $450.00 to Dr. Patrick Conner, $300.00 to Dr. Ronald Singer and $300.00 to Dr. Craig D. Brigham.
6. Defendant shall pay the costs.
This 7th day of August 2001.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/________________ CHRISTOPHER SCOTT COMMISSIONER
 S/______________ RENE C. RIGGSBEE COMMISSIONER